**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LINDSEY A. KIDD<br><br>        Plaintiff,<br><br>    v.<br><br>THOMSON REUTERS CORPORATION,<br><br>        Defendant. | Civ. No. 1:16-cv-01668-JMF<br><br><br><br>**ECF Case** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT THOMSON
REUTERS CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Attorneys for Defendant*
*Thomson Reuters Corporation*

# TABLE OF CONTENTS

Table of Contents ................................................................................................. ii

Statement of the Case ............................................................................................ 1

Statement of Facts ................................................................................................. 3

Argument ............................................................................................................... 8

I.     THOMSON REUTERS IS NOT A CONSUMER REPORTING AGENCY WITHIN THE
       MEANING OF THE FAIR CREDIT REPORTING ACT. ............................................ 8

       A.     Thomson Reuters Does Not Assemble Consumer Information for the
              Purpose of Offering Consumer Reports. ............................................ 10

       B.     Thomson Reuters Does Not Regularly Assemble Consumer
              Information for the Purpose of Offering Consumer Reports. ............ 16

II.    THOMSON REUTERS DOES NOT ISSUE CONSUMER REPORTS. ........................... 18

       A.     Thomson Reuters is Not a Consumer Reporting Agency. ................. 19

       B.     Purpose, Not Use, is the Test if the Entity Supplying the Information
              Takes Reasonable Precautions. ......................................................... 20

       C.     Thomson Reuters Lacks the Requisite Intent. ................................... 22

Conclusion ........................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Boothe v. TRW Credit Data*,
   523 F. Supp. 631 (S.D.N.Y. 1981) ...................................................................22

*Bustamante v. Napolitano*,
   582 F.3d 403 (2d. Cir. 2009) ..........................................................................10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)........................................................................................8

*Ford Motor Co. v. United States*,
   94 Fed. Cl. 211 (2010)...................................................................................21

*Johnson v. Fed. Express Corp.*
   147 F. Supp. 2d 1268, 1275 (M.D. Ala. 2001)................................................17

*Landry v. Time Warner Cable, Inc.*
   No. 1:16-cv-00507 (D.N.H. filed Nov. 17, 2016) .................................................7

*Lewis v. Ohio Prof'l Elec. Network LLC*,
   190 F. Supp. 2d 1049 (S.D. Ohio 2002) ...............................................11, 14, 16

*Liberi v. Taitz*,
   2012 WL 10919114 (C.D. Cal. Mar. 16, 2012).........................................*passim*

*Mangum v. Action Collection Serv., Inc.*,
   2007 WL 1959076, at *4 (D. Idaho July 3, 2007)............................................12

*Mangum v. Action Collection Serv., Inc.*,
   575 F.3d 935 (9th Cir. 2009) ..........................................................................12

*Ori v. Fifth Third Bank*,
   603 F. Supp. 2d 1171 (E.D. Wis. 2009) ..........................................................13

*Rugg v. HANAC Inc.*,
   2002 WL 31132883, at *3 (S.D.N.Y. Sept. 26, 2002) ......................................17

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)........................................................................................21

*Soroka v. JP Morgan Chase & Co.*,
   500 F. Supp. 2d 217 (S.D.N.Y. 2007) ...............................................................10

*Sweet v. LinkedIn Corp.*,
   2015 WL 1744254 (N.D. Cal. Apr. 14, 2015)..............................................20, 21

**Rules and Statutes**

16 C.F.R. § 603(d)-5D (1990) .................................................................................21

Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ....................................*passim*

Fed. R. Civ. P. 56(a)..................................................................................................8

**Other Authorities**

40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT
   REPORTING ACT, 2011 WL 3020575.........................................19, 20, 21, 23

*American Heritage Dictionary* (3d ed. 1996)....................................................11, 16

OED Online, http://www.oed.com...................................................................10, 16

U.S. Fed. Trade Comm'n, Advisory Opinion Letter to Goeke
   (June 9, 1998)...................................................................................................16

*Webster's New World College Dictionary* (5th ed. 2016)................................10, 16

**STATEMENT OF THE CASE**

Plaintiff's claims are predicated on the untenable position that Defendant Thomson Reuters Corporation ("Thomson Reuters") is a "consumer reporting agency" that issues "consumer reports" within the meaning of the Fair Credit Reporting Act, 15 U.S.C. § 1681a ("FCRA").  No court has ever held that Thomson Reuters is subject to FCRA, which regulates disclosure and use of consumer information collected to determine eligibility for credit, insurance, and employment.  Indeed, Plaintiff's position would extend the reach of FCRA to all entities that offer public records services—regardless of their *purpose* for providing such information.  The plain meaning of the statute forecloses such an expansive and unreasonable interpretation.

The Thomson Reuters online investigative product at issue here— "CLEAR"—serves important functions not regulated by FCRA, including enabling law enforcement officials to research suspected offenders and helping government agencies investigate fraud.  As just one recent example, the San Bernardino Police Department used CLEAR in connection with last year's mass shooting in that city to collect and filter data regarding suspected perpetrators that ultimately led to their being located and subdued.

There is no evidence—*none*—that Thomson Reuters regularly engages in the assembly of information for the purpose of furnishing "consumer reports," *i.e.*,

reports prepared for use in connection with credit, insurance, and employment applications. To the contrary, Thomson Reuters undertakes concerted efforts to ensure that its CLEAR product is used only for purposes not regulated by FCRA. As shown in the accompanying Statement of Undisputed Material Facts ("Statement") and discussed below, Thomson Reuters maintains institutionalized checks at each stage of the customer acquisition, application, contracting, and support processes to detect and weed out potential abusers and misusers of the CLEAR platform.

Although no company can control how all its customers use its products, basic arithmetic reveals the effectiveness of Thomson Reuters's comprehensive misuse prevention efforts. Whereas the average number of search queries conducted *each day* on the CLEAR platform exceeds 100,000, there have only been 46 reports of suspected misuse of the product (including the one reported by Plaintiff here) in the four years preceding the Complaint—12 of which were found to be false alarms upon investigation (the other 34 either had their subscriptions cancelled or reaffirmed in writing that they would not misuse CLEAR). *See* Statement at ¶¶ 13, 68. In other words, the overwhelming majority of Thomson Reuters's CLEAR subscribers use the product for its intended and expected non-FCRA investigative purpose, and those who do not are either brought into compliance or terminated.

Plaintiff's FCRA claims thus fail as a threshold matter because:  (i) Thomson Reuters is not a consumer reporting agency that "*regularly engages* in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers *for the purpose of furnishing consumer reports* to third parties" and (ii) Thomson Reuters does not issue "consumer reports," as the term is defined in FCRA.  *See* 15 U.S.C. § 1681a (emphasis added).  As such, Thomson Reuters is not subject to regulation by FCRA and is entitled to summary judgment.

### STATEMENT OF FACTS

This case concerns Consolidated Lead Evaluation And Reporting ("CLEAR"), a web-based research platform offered by Thomson Reuters that provides subscribers access to public records information for non-FCRA-regulated investigative purposes.  *See* Statement at ¶¶ 3-4.  CLEAR is used primarily by law enforcement agencies, inspector general offices, and other public and private entities to investigate criminal activity and suspected fraud.   *See* Statement at ¶ 5.  As of January 1, 2016, CLEAR had more than 80,000 authorized end users, approximately 87% of which were in the public sector.  *See* Statement at ¶ 7.   The potential non-FRCA market for the CLEAR product is estimated to be several hundred millions of dollars annually.  *See* Statement at ¶ 20.

3

A user of CLEAR may query the online platform for a name and retrieve potentially responsive information, such as aliases, court docket references, and other information associated with the name searched.[1]  *See* Statement at ¶ 14. Users may print out their search results, but Thomson Reuters does not separately prepare reports for subscribers or otherwise maintain their search results.  *See* Statement at ¶ 15.

CLEAR includes public records information regulated under the Gramm-Leach-Bliley Act ("GLBA") and Drivers' Privacy Protection Act ("DPPA").  *See* Statement at ¶ 9.  CLEAR users must have a permitted use under the GLBA, DPPA, and state voter laws to access CLEAR and must indicate this intended use before conducting CLEAR searches.  *See* Statement at ¶¶ 10, 61.  Thomson Reuters's agreements with third parties that license data available through the CLEAR database prohibit usage for FCRA purposes.  *See* Statement at ¶ 19.

Thomson Reuters does not intend or expect for CLEAR to be used for FCRA purposes and has implemented a comprehensive approach to prevent such misuse. *See* Statement at ¶¶ 16-18, 59. This approach includes sales and service training on prohibited uses, marketing admonitions, contractual prohibitions,

---

[1] As such, searches for common names such as "John Smith" or "Susan Jones" invariably generate information about more persons than searches for less common names such as "Quentin Tarantino."

customer certifications, customer vetting ("credentialing"), and, as needed, remedial action.  *See* Statement at ¶¶ 21-68.

As a first step, Thomson Reuters trains its employees, including sales teams, customer service representatives, and account managers, in the authorized and unauthorized uses of CLEAR and methods to detect potential misuse of the product for FCRA-regulated purposes.  *See* Statement at ¶¶ 22-32.  Before selling CLEAR, Thomson Reuters employees must complete a training course and examination instructing them that Thomson Reuters is not a consumer reporting agency, that its products may not be used for FCRA purposes, and that employees have a responsibility to watch for and report potential FCRA issues.  *See id*.

On the customer acquisition side, Thomson Reuters's marketing materials, instructional handouts, and customer training explain that using CLEAR for any FCRA-regulated purpose is forbidden.  *See* Statement at ¶¶ 33-38.  Thomson Reuters instructs its sales representatives that they may not sell CLEAR to anyone that lacks a permitted use for the product under the GLBA.  *See* Statement at ¶ 39.

In addition, CLEAR subscribers acknowledge and agree in writing during the contracting process that they may not and will not use CLEAR for any FCRA purpose.  *See* Statement at ¶ 40.  For example, every CLEAR subscriber accepts and agrees to be bound by Thomson Reuters's "Subscriber Agreement" and the "Supplier Additional Terms" mandated by third-party licensors of data available

through CLEAR.  *See* Statement at ¶¶ 41-44.  Both the Subscriber Agreement and Supplier Additional Terms state that Thomson Reuters is not a consumer reporting agency and that any FCRA-regulated use is prohibited.  *See* Statement at ¶¶ 42, 44. In addition, every subscriber certifies that it will not access CLEAR for any FCRA purpose.  *See* Statement at ¶ 42.

Applicants seeking access to the CLEAR online platform must further pass a "credentialing" process to validate that they have an authorized DPPA and/or GLBA use for CLEAR and affirm that they will not use CLEAR for FCRA-regulated purposes.  *See* Statement at ¶ 52.  As part of this process, every potential subscriber must complete an Account Validation and Credentialing form ("AVC Form") declaring how the subscriber intends to use CLEAR.  *See* Statement at ¶ 45.  The AVC Form also requires subscribers to certify that they and their authorized users will not access CLEAR for any FCRA-regulated uses.  *See* Statement at ¶¶ 46-51.

Thomson Reuters reviews every new subscriber's application, AVC Form, and website to detect "red flags" indicating FCRA-regulated commercial services, such as employment background checks.  *See* Statement at ¶ 54-55.  Such red flags are escalated to a management-level team (the "Credentialing Committee"), which can reject the subscription or require the applicant to confirm in writing that it will not use CLEAR for FCRA purposes.  *See* Statement at ¶¶ 55-56.  CLEAR

subscribers also must periodically reaffirm the accuracy of information provided during the initial subscription process. *See* Statement at ¶¶ 57-58. Thomson Reuters terminates the CLEAR subscription of any customer that fails the credentialing process. *See* Statement at ¶ 53.

Although reports of misuse for FCRA purposes are rare, Thomson Reuters instructs employees to report any suspected misuse of CLEAR and investigates all such reports. *See* Statement at ¶¶ 62-64. Unless the subscriber proves there was no misuse, Thomson Reuters warns the subscriber that using CLEAR for FCRA purposes violates Thomson Reuters's contract and further requires an "attestation" from the subscriber reaffirming its authorized use/s for CLEAR and commitment not to use CLEAR for any FCRA purpose. *See* Statement at ¶ 65. If the subscriber will not or cannot agree to these conditions, Thomson Reuters terminates the subscriber's access to CLEAR. *See* Statement at ¶ 66.

Thomson Reuters had never previously been named as a defendant in a lawsuit alleging use of CLEAR for a FCRA purpose. *See* Statement at ¶ 69.[2] In addition, the Federal Trade Commission ("FTC") has accepted Thomson Reuters's position that it does not offer or permit use of CLEAR for employment screening and other FCRA purposes. *See* Statement at ¶¶ 70-72.

---

[2] Last week, a second lawsuit was filed against Thomson Reuters under FCRA. *See Landry v. Time Warner Cable, Inc.* No. 1:16-cv-00507 (D.N.H. filed Nov. 17, 2016).

**ARGUMENT**

Summary judgment is appropriate where, as here, a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Thomson Reuters is entitled to summary judgment because Plaintiff cannot establish that Thomson Reuters is a "consumer reporting agency" that furnishes "consumer reports," as both terms are defined in the Fair Credit Reporting Act.[3]

## I.   THOMSON REUTERS IS NOT A CONSUMER REPORTING AGENCY WITHIN THE MEANING OF THE FAIR CREDIT REPORTING ACT.

Plaintiff's entire lawsuit crumbles under the weight of a single fact— Thomson Reuters is not a "consumer reporting agency."  Each of Plaintiff's claims alleges that Thomson Reuters failed to comply with a provision of FCRA with which only consumer reporting agencies must comply.  As a non-consumer

---

[3] The Court's Civil Case Management Plan and Scheduling Order (DE 21) provides for these threshold issues to be resolved in Phase I.  Under FCRA, these two definitional questions turn on the conduct and intent of Thomson Reuters, and it does not matter whether the Complaint's allegations relating to the Georgia Department of Public Health's conduct are true or false.  Thomson Reuters thus reserves for any further phases all other defenses to the merits of Plaintiff's claims, including causation, and to her effort to certify a class.

8

reporting agency, however, Thomson Reuters is not required to comply with any of these provisions.  *Liberi v. Taitz*, 2012 WL 10919114, at *5 (C.D. Cal. Mar. 16, 2012)  ("[The defendant] may satisfy its initial burden on all of the remaining [FCRA] claims if it establishes that there is an absence of any genuine issue of material fact regarding whether it was acting as a consumer reporting agency in the alleged transactions.").

FCRA specifically defines "consumer reporting agency":

> The term "consumer reporting agency" means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, *regularly engages* in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers *for the purpose of furnishing consumer reports to third parties*, and which uses any means or facility of interstate commerce *for the purpose of preparing or furnishing consumer reports*.

15 U.S.C. § 1681a (West) (emphases added).

Thomson Reuters does not qualify as a consumer reporting agency for at least two distinct reasons:  (a) Thomson Reuters does not assemble consumer information *for the purpose* of preparing or furnishing consumer reports; and (b) Thomson Reuters does not *regularly engage* in the practice of assembling consumer information for the purpose of offering consumer reports.

### A.   Thomson Reuters Does Not Assemble Consumer Information for the Purpose of Offering Consumer Reports.

A plain reading of FCRA's definition of "consumer reporting agency" virtually compels the interpretation that to qualify as a consumer reporting agency, an entity must have the subjective intent to prepare and furnish "consumer reports."  It is well-established in this Circuit that statutory interpretation "begins with the plain meaning of a law's text and, absent ambiguity, will generally end there."  *Bustamante v. Napolitano*, 582 F.3d 403 (2d. Cir. 2009) (citation omitted).  Courts in the Southern District of New York apply this principle in interpreting FCRA.  *See, e.g.*, *Soroka v. JP Morgan Chase & Co.*, 500 F. Supp. 2d 217, 221 (S.D.N.Y. 2007) ("To determine whether the offer of credit contained in Defendants' letter constituted a firm offer within the meaning of the FCRA, the Court looks to the plain meaning of the relevant language in the FCRA.").

The plain meaning of the word "purpose" denotes an intent or an aim for a particular result.  The Oxford English Dictionary, Webster's New World Dictionary, and American Heritage Dictionary all define "purpose" using the word "intend,"[4] an inherently subjective term.

---

[4] Those dictionaries respectively define "purpose" as:  (a)  "[t]he reason for which something is done or made, or for which it exists; the result or effect intended or sought; the end to which an object or action is directed; aim"; (b) "something one intends to get or do; intention; aim"; and (c) "[a] result or an effect that is intended or desired; an intention."  *Purpose*, OED Online, http://www.oed.com/view/Entry/154972?rskey=6BROlC &result=1 (last visited Nov. 14, 2016); *Webster's New World College Dictionary* 1182 (5th ed. 2016); (continued…)

Consistent with this plain meaning interpretation, courts consider an entity's intent or business objective when determining whether that entity is a consumer reporting agency.

For example, in *Liberi v. Taitz*, the court found that the defendant was not operating as a consumer reporting agency in offering a public records search engine when it "established that it did not *intend* the Background Reports [it issued to customers] to be credit reports."  2012 WL 10919114, at *6 (emphasis added). The court emphasized that (a) the Background Reports containing search results were not "person-specific," *i.e.*, they included information responsive to the users' search terms and did not purport to offer information pertaining only to a specific person,[5] (b) the defendant required customers to agree not to use the reports for FCRA purposes, and (c) the defendant did not maintain copies of the reports (although it had access to historical searches).  *Id.* at *4-9.

Similarly, in *Lewis v. Ohio Prof'l Elec. Network LLC*, the court looked at the defendant's subjective intent in determining whether it is a consumer reporting agency.  190 F. Supp. 2d 1049 (S.D. Ohio 2002).  The court found that the defendant, which operated an electronic sharing network for public arrest data, "*knew* and in fact *intended* for parties such as potential employers and insurance

---

*American Heritage Dictionary* 1471(3d ed. 1996).

[5] Although the search results were displayed in the form of a "Background Report," they in fact reflected a "general search of potential identities."  *Id.*

companies to access the . . . information, and that the information might be used in employment and other decisions." *Id.* at 1058 (internal citations omitted) (emphasis added).  Only because the defendant intentionally sold arrest data for FCRA-regulated uses did the court conclude that the defendant in *Lewis* was a consumer reporting agency.

As a final example, the court in *Mangum v. Action Collection Serv., Inc.*, also looked to the defendants' intent in assembling information to determine whether they were consumer reporting agencies.  2007 WL 1959076, at *4 (D. Idaho July 3, 2007), *aff'd in part, rev'd in part by* 575 F.3d 935 (9th Cir. 2009).  In *Mangum*, the plaintiff, a former police dispatcher, sued two debt collection agencies under FCRA, alleging that they provided personal information to her employer that led to her termination.  *See Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 937 (9th Cir. 2009) (affirming relevant part of district court ruling). The district court held that the defendants were not consumer reporting agencies because they assembled information to "collect debt on behalf of their clients" and not "for the purpose of providing consumer reports to third parties."  2007 WL 1959076, at *4.  The court noted that although these agencies may have provided information to police departments upon request, collection of debt is the "true business purpose of a collection agency."  *Id.*

These cases confirm that the critical inquiry in determining whether Thomson Reuters is a consumer reporting agency is whether it *intends* to furnish "consumer reports" to third parties.  As discussed below in Section II, "consumer report" requires, in part, a showing that the information in question was "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for-- (A) credit or insurance . . . ; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title."  15 U.S.C. § 1681a (West).

Establishing whether an entity is a consumer reporting agency thus requires a determination of whether it offers or permits public records information to be "used" or "collected" for a FCRA-regulated purpose.  *See, e.g., Ori v. Fifth Third Bank*, 603 F. Supp. 2d 1171, 1175 (E.D. Wis. 2009) ("Plaintiff [did] not allege that [defendant] obtain[ed] information for the purpose of issuing reports of this type [referencing FCRA "consumer report" definition].").

Here, it is beyond genuine material dispute that Thomson Reuters does not intend or expect for its CLEAR platform to be used for FCRA-regulated purposes.  *See* Statement at ¶¶ 16-20,  59.  As discussed above and demonstrated in its Statement of Undisputed Material Facts, Thomson Reuters manifests this purpose by taking steps at every stage to prevent subscribers from using the CLEAR platform for FCRA-regulated purposes.   *See generally* Statement at ¶¶ 21-68.

13

These measures begin before Thomson Reuters allows any use of CLEAR. Thomson Reuters includes explicit language prohibiting FCRA-regulated uses of CLEAR in its marketing and customer "leave behind" materials. *See* Statement at ¶¶ 34-37. And, like the defendant in *Liberi*, Thomson Reuters requires CLEAR subscribers to sign contracts agreeing not to use CLEAR for FCRA-regulated purposes. *See* Statement at ¶¶ 40-51. Before getting access to CLEAR, all prospective subscribers undergo additional vetting by Thomson Reuters to confirm their DPPA and/or GLBA uses and to identify any "red flags" that require follow up. *See* Statement at ¶¶ 52-58. Unlike the defendant in *Lewis v. Ohio*, who "knew and in fact intended for parties such as potential employers and insurance companies to access the . . . information," 190 F. Supp. 2d at 1058, Thomson Reuters does not sell CLEAR to companies that it believes would use the product for employment screening and other FCRA-regulated purposes. *See* Statement at ¶¶ 16-20, 33, 39.

Thomson Reuters's efforts do not end at the point of sale. All employees involved with CLEAR, including account managers and customer service representatives, are trained to monitor subscriber and third party communications for signs of product misuse and to elevate any concerns to Thomson Reuters's Compliance Office, which then investigates the matter. *See* Statement at ¶¶ 62, 64. Incidents of misuse are rare. *See* Statement at ¶ 63. Thomson Reuters requires any

14

subscriber suspected of misuse to reaffirm in writing that it will not use CLEAR for FCRA-regulated purposes and terminates agreements with subscribers unwilling or unable to use CLEAR as permitted.  *See* Statement at ¶¶ 65-66.

Thomson Reuters's lack of intent to furnish consumer reports also is evidenced by its data licensing agreements with third parties, which prohibit Thomson Reuters from offering data through CLEAR for purposes regulated by FCRA.  *See* Statement at ¶ 19.  Thomson Reuters complies with those agreements.

The CLEAR platform is primarily used by federal, state, and local law enforcement agencies to investigate crimes and by inspectors general offices to investigate suspected fraud.  *See* Statement at ¶ 5.  Although nearly 90 percent of CLEAR end users are government employees, the product is also used in the private sector for non-FCRA investigative and commercial research purposes, including detection of corporate fraud and research into potential business partners.  *See* Statement at ¶¶ 5-7, 27.

Thomson Reuters would not be allowed to serve this lucrative non-FCRA market if it allowed subscribers to use the CLEAR platform for FCRA-regulated purposes.  *See* Statement at ¶ 20.  Simply put, if CLEAR were FCRA-regulated, the product could not have been used to find the San Bernardino shooters because FCRA prohibits consumer reporting agencies from issuing consumer reports for any *non-enumerated* purpose, 15 U.S.C. § 1681b (West).  If Thomson Reuters

15

were to offer the CLEAR platform with the intent of furnishing consumer reports, it would be proscribed from selling the product to virtually all its current customers.[6]  This prohibition gives Thomson Reuters every incentive to prevent its product from being used for FCRA-regulated purposes.

**B.    Thomson Reuters Does Not Regularly Assemble Consumer Information for the Purpose of Offering Consumer Reports.**

To establish that Thomson Reuters is a consumer reporting agency, Plaintiff must show not only that Thomson Reuters assembles information "for the purpose of furnishing consumer reports," but also that it "regularly engages" in this practice.[7]  According to the plain meaning of the word "regular," engagement in an activity requires that it be "usual" or "habitual."[8]  The corollary is that an entity

---

[6] *Cf.* U.S. Fed. Trade Comm'n, Advisory Opinion Letter to Goeke (June 9, 1998) (state agencies, "if treated as CRAs [consumer reporting agencies] . . . would be forced to refuse access to parties who seek criminal records information for such common and useful purposes as research and journalistic endeavors, or for aid in law enforcement.").

[7] Although some courts analyze the issue of whether an entity "regularly" assembles or evaluates consumer credit information separately from the issue of whether that entity's purpose in assembling information was to furnish consumer reports, *see, e.g., Lewis*, 190 F. Supp. 2d at 1057, these elements are naturally interdependent, as evidence of the regularity of an entity's conduct is intertwined with its purpose in engaging in such conduct.

[8] The Oxford English Dictionary defines "regular" as "[u]sed, done, or happening on a frequent or habitual basis; usual, customary"; Webster's New World Dictionary defines "regular" as "consistent or habitual in action"; and the American Heritage Dictionary defines "regular" as "customary, usual or normal." *Regular*, OED Online, http://www.oed.com/view/Entry/161414? redirectedFrom=regular (last visited Nov. 14, 2016); *Webster's New World College Dictionary* 1224 (5th ed. 2016); *American Heritage Dictionary* 1521(3d ed. 1996).

that only occasionally or sporadically engages in an activity cannot be said to do so "regularly."

Courts interpret "regularly engages" in the consumer reporting agency context using the plain meaning of "regular."

As an example, in *Johnson v. Fed. Express Corp.*, the court interpreted the term "regularly engages" to require that an entity "provide consumer reports as part of [its] usual, customary, and general course of business if [it] is to qualify as a 'consumer reporting agency' under the FCRA." 147 F. Supp. 2d 1268, 1275 (M.D. Ala. 2001). The court reasoned that "[b]y regulating only those consumer reporting agencies who 'regularly engage' in reporting, Congress opted for incomplete coverage of the industry." *Id.*

Likewise, the court in *Rugg v. HANAC Inc.* held that a plaintiff's identification of only "isolated instances" of alleged investigations conducted for employment purposes "fall[s] short of what Plaintiff is required to prove." 2002 WL 31132883, at *3 (S.D.N.Y. Sept. 26, 2002). The court held that although the plaintiff's affidavit did not allege that the defendant "regularly engaged" in investigations for FCRA purposes, it denied defendant's motion to dismiss on the ground that the plaintiff might uncover such evidence during discovery. *Id.*

Here, discovery on this issue is complete, and there is no evidence that Thomson Reuters regularly engages in the assembly of information for the purpose

17

of furnishing consumer reports. To the contrary, the evidence shows that since May 1, 2012 to the date of the Complaint, there have been only 46 investigations of alleged misuse of CLEAR for FCRA purposes—12 of which closed with no further action after a determination that the subscriber had not misused CLEAR for a FCRA purpose. *See* Statement at ¶¶ 67-68. To put that number in context, there were over 80,000 CLEAR end users as of January 1, 2016, and those subscribers perform on average more than 100,000 searches on CLEAR each day. *See* Statement at ¶¶ 7, 13. In the past four-and-a-half years, that comes to more than 100 million total searches (excluding weekends and holidays) using CLEAR.

At most, there are only isolated incidents of subscriber misuse of CLEAR. Even assuming that the 34 investigations where Thomson Reuters took further action all involved prohibited FCRA uses, that number represents a tiny fraction of the tens of millions of searches conducted using the CLEAR platform over the last four and a half years. Because Plaintiff cannot show that Thomson Reuters "regularly engages" in the practice of assembling consumer information for the purpose of offering consumer reports, she cannot prove that Thomson Reuters is a consumer reporting agency for this additional reason.

## II.   THOMSON REUTERS DOES NOT ISSUE CONSUMER REPORTS.

Although CLEAR subscribers may print the results of their searches, such results do not meet the statutory definition of a "consumer report":

[A]ny written, oral, or other communication of any information *by a consumer reporting agency* bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living *which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor* in establishing the consumer's eligibility for -- (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a (West) (emphasis added).

Search results generated by the CLEAR platform do not qualify as consumer reports under this definition for at least three reasons intertwined with the analysis above:  (a) Thomson Reuters is not a consumer reporting agency; (b) Thomson Reuters does not collect information made available on the CLEAR platform to be used for FCRA-regulated purposes and does not expect the information to be used for those purposes; and (c) Thomson Reuters takes reasonable precautions to prevent use of the CLEAR platform for FCRA purposes.

## A.    Thomson Reuters is Not a Consumer Reporting Agency.

The question of whether or not CLEAR subscribers generate "consumer reports" must be considered in conjunction with the "consumer reporting agency" analysis addressed above.  As the FTC has noted, "[t]he terms 'consumer reporting agency' in section 603(f) and 'consumer report' in section 603(d) are mutually dependent and must be construed together."  40 YEARS OF EXPERIENCE WITH

19

THE FAIR CREDIT REPORTING ACT, 2011 WL 3020575 (F.T.C), at *13 (the

"40 Years FTC Report").  Thus, a communication may be a "consumer report"

only when issued by a "consumer reporting agency," and Thomson Reuters does

not issue consumer reports because, as discussed above, it is not a consumer

reporting agency.  *See Sweet v. LinkedIn Corp.*, 2015 WL 1744254, at *6 (N.D.

Cal. Apr. 14, 2015) ("To meet the definition of a consumer report, a

communication must be made 'by a consumer report[ing] agency.'").

### B.     Purpose, Not Use, is the Test if the Entity Supplying the Information Takes Reasonable Precautions.

As discussed above, FCRA sets forth a subjective test for evaluating whether

or not an entity provides "consumer reports" within the meaning of the Act.

At the outset, it bears emphasis that the FTC, which has enforcement

authority for FCRA, has stated that even if a report has been used for a FCRA-

regulated purpose, that report does not constitute a "consumer report" if the entity

has taken "reasonable steps" to ensure that the report is not used for FCRA

purposes.  Specifically, the FTC has explained that "if the entity supplying the

report has taken reasonable steps to insure that the report is not used for [a FCRA-

regulated] purpose, and if it neither knows of, nor can reasonably anticipate such

use, the report should not be deemed a consumer report by virtue of uses beyond

the entity's control."  40 Years FTC Report, 2011 WL 3020575, at *16.  The FTC

outlined a non-exclusive list of measures an entity may take that "might establish

that it does not reasonably anticipate [a FCRA-regulated] use of the report": (a) "requiring the recipient to certify that the report will not be used to determine eligibility for a permissible purpose"; (b) "auditing report recipients for compliance"; or (c) "taking appropriate action against those who violate such certifications." *Id.*[9]

In granting summary judgment to the defendant, the court in *Liberi v. Taitz* concluded that "Background Reports" generated by the defendant's electronic search engine were not consumer reports because the defendant did not intend or expect that they would be used for FCRA-regulated purposes. 2012 WL 10919114, at *7 ("Plaintiffs' own evidence confirms that Intelius did not intend the Background Reports to be governed by the FCRA"). As discussed above, the court

---

[9] The FTC's interpretation should be accorded deference under the *Skidmore* four-factor analysis:

1. There is "thoroughness evident in the agency's interpretation";

2. The validity of the FTC's reasoning "can be ascertained by reference to the agency interpretations themselves and their articulated rationales," *Ford Motor Co. v. United States*, 94 Fed. Cl. 211, 219 (2010) (citation omitted);

3. The FTC's interpretation is "consisten[t] with earlier and later pronouncements," *compare* 16 C.F.R. § 603(d)-5D (1990) *with* 2011 WL 3020575, at *16; and

4. The FTC's "body of experience" and unique expertise in FCRA interpretation give it the "power to persuade," and its interpretation should especially be accepted in light of the "substantial deference for agency decisions made 'in pursuance of official duty.'"

*See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Sweet,* 2015 WL 1744254, at *5 n.59 (FTC's 40 Years report "provide[s] persuasive guidance from the agency charged with enforcing and interpreting the FCRA").

considered, among other factors, that the defendant did not maintain copies of the reports and that the reports were non-person specific.  As discussed below, this reasoning applies with equal force to Thomson Reuters.

### C.    Thomson Reuters Lacks the Requisite Intent.

The search results generated by the CLEAR platform are not consumer reports because Thomson Reuters does not intend or expect that they will be used for FCRA-regulated purposes.  *See generally* Statement at ¶¶ 16-68.  Like the defendant's database in *Liberi*, the CLEAR platform produces "non-person specific information matching inputted search terms," evidencing that these reports were "not intended to determine an individual's credit worthiness."  2012 WL 10919114, at *7; *see also* Statement at ¶¶ 14-15.[10]  Further, Thomson Reuters is contractually prohibited by those who provide it with the public records information from using such information in CLEAR for purposes regulated by FCRA; if Thomson Reuters intended to make that information available for FCRA-regulated uses, it would not have agreed to this contractual limitation.  *See* Statement at ¶ 19.

Nor does random isolated misuse of the product for a FCRA-regulated purpose convert information generated by CLEAR into "consumer reports"

---

[10] *See also Boothe v. TRW Credit Data*, 523 F. Supp. 631, 634 (S.D.N.Y. 1981) ("The proper focus for determining whether a report falls under the Act's definition of consumer report is the purpose for which it was collected[] and . . . released.").

because Thomson Reuters takes "reasonable steps" to ensure that subscribers do not use the platform for FCRA purposes.  As discussed above, Thomson Reuters maintains institutionalized checks at all stages, including post-sale, to make sure that its subscribers are aware of and abide by Thomson Reuters's contractual restrictions on use of the CLEAR platform—and follow the law.  *See* Statement at ¶¶ 21, 59-60.

In fact, Thomson Reuters has adopted each of the precautionary measures identified by the FTC in its report—and more.  Consistent with the FTC guidance, CLEAR subscribers are required to "certify that the [product] will not be used to determine the eligibility for a permissible purpose" in their subscription agreements.  2011 WL 3020575 (F.T.C.), at *16; *see* Statement at ¶¶ 40-51.  Thomson Reuters has also implemented policies to monitor inquires and complaints to "audit[] report recipients for compliance" and detect possible misuse of the CLEAR platform as well as attestation and termination processes to "tak[e] appropriate action against those who violate such certifications."  *Id.*; *see* Statement at ¶¶ 60-68.  Finally, Thomson Reuters takes the additional precautions outlined in its accompanying Statement to reinforce the prohibition on using CLEAR for any FCRA-regulated purposes.  *See generally* Statement at ¶¶ 21-68.

      *           *           *           *

If this Court were to find that Thomson Reuters is a consumer reporting agency, it would follow that *all* companies in the public records information space are consumer reporting agencies because no one can guarantee that its product will *never* be used for a FCRA-regulated purpose.  Plaintiff's contention that Thomson Reuters is a consumer reporting agency—notwithstanding its undisputed intent and program to prohibit FCRA use—would effectively foreclose public records products designed for non-FCRA investigative needs.  Plaintiff's position here is similar to the argument made by the plaintiffs in *Liberi v. Taitz* "that the Background Report [offered by the defendant] could be an FCRA credit report because [the defendant] had no way to monitor whether people utilized Background Report information for FCRA purposes."  2012 WL 10919114, at *7. The court rejected this reasoning, under which "*any* entity that provided any information potentially affecting a consumer's creditworthiness would automatically be liable under the FCRA," and granted summary judgment to the defendant.  *Id.*

As the court in *Liberi v. Taitz* observed, and as reflected in the FTC interpretative guidance, to determine a company's liability based on the unanticipated behavior of its customers would do nothing to further FCRA's purpose of protecting consumers.  To the contrary, it would constrict the flow of

information by expanding FCRA's domain to encompass every entity in the public

records information market.  No court has ever read the statute so broadly.

## CONCLUSION

For the foregoing reasons, Thomson Reuters's motion for summary

judgment should be granted.

November 21, 2016                                    Respectfully submitted,


                                                     COVINGTON & BURLING LLP


                                              BY:    s/ Neil K. Roman


Eric C. Bosset                                       Neil K. Roman
One CityCenter                                       The New York Times Building
850 Tenth Street NW                                  620 Eighth Avenue
Washington, D.C. 20001                               New York, NY 10018
(202) 662-6000                                       (212) 841-1000
ebosset@cov.com                                      nroman@cov.com

                                                     *Attorneys for Defendant*
                                                     *Thomson Reuters Corporation*