UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
LINDSAY A. KIDD,                                                       :
                                                                       :
                                          Plaintiff,                   :    16-CV-1668 (JMF)
                                                                       :
                      -v-                                              :    OPINION AND ORDER
                                                                       :
THOMSON REUTERS CORPORATION,                                           :
                                                                       :
                                          Defendant.                   :
                                                                       :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In 2014, Plaintiff Lindsey A. Kidd applied for a job with the Georgia Department of Public Health ("GaDPH"). Using a subscription-based online research platform operated by Defendant Thomson Reuters Corporation ("Thomson Reuters"), the GaDPH obtained information indicating that Kidd had been convicted of a crime. That information turned out to be wrong, but in the meantime it appears to have cost Kidd the job. As a result, she now brings claims against Thomson Reuters under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, ("FCRA"), a statute that protects consumers with respect to the collection and dissemination of personal information collected by "consumer reporting agencies." The question presented here, which raises issues of first impression in this Circuit, is whether Thomson Reuters qualifies as a "consumer reporting agency" covered by the statute. The Court concludes that it does not and, thus, grants summary judgment to Thomson Reuters with respect to all of Kidd's claims.

## BACKGROUND

      The following relevant facts, taken from the Complaint and admissible materials submitted by the parties, are undisputed unless otherwise noted. *See Costello v. City of*

*Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).  At issue in this case is an online research platform — called Consolidated Lead Evaluation and Reporting or "CLEAR" for short — offered by Thomson Reuters to subscribers.  (Docket No. 49 ("Def.'s SOF") ¶ 3).  CLEAR "provides subscribers with access to proprietary and public records information for investigative purposes." (*Id.* ¶¶ 4, 8).  It is primarily used by federal, state, and local government agencies to investigate crimes and suspected fraud.  (*Id.* ¶¶ 5-7).  The platform includes public records information regulated by the Gramm-Leach-Bliley Act ("GLBA") and the Driver's Privacy Protection Act ("DPPA"), so prospective customers are required to have permitted uses under those statutes to access data and must identify and certify those permitted uses to Thomson Reuters in various documents.  (*Id.* ¶¶ 9, 10).  Similarly, each time an authorized user seeks access to CLEAR, that user must select a permitted use for undertaking the search (such as a use permitted by the GLBA, the DPPA, or state voter registration laws).  (*Id.* ¶ 11).  Only then can the user enter a search query into CLEAR.  (*Id.* ¶ 12).  A subscriber searching CLEAR by using a name may retrieve a wide array of records — including aliases, court docket references, criminal history, and other information associated with the name.  (*Id.* ¶ 14; Docket No. 57 ("Pl.'s SOF") ¶ 14).

Significantly, Thomson Reuters explicitly prohibits the sale and use of CLEAR for any purpose regulated by the FCRA.  (Def.'s SOF ¶ 18).  It communicates and enforces that prohibition in several ways, including employee training, mandatory employee reporting, marketing materials, contractual requirements, mandatory customer certifications, customer vetting, investigations, and remedial actions.  (*Id.* ¶¶ 21-68).  Additionally, Thomson Reuters will not sell CLEAR to customers that lack a permitted use for the product or have only FCRA-regulated uses.  (*Id.* ¶ 39).  Despite these efforts, Thomson Reuters has discovered instances in which CLEAR subscribers have used the platform for employment screening and other purposes

regulated by the FCRA. (*Id.* ¶ 63; Pl.'s SOF ¶¶ 60, 63). When the company learns of such alleged misuse, it opens an investigation. (Def.'s SOF ¶ 64). There were forty-six such investigations from May 1, 2012, through the filing of Kidd's complaint. (*Id.* ¶ 68). After conducting investigations in those cases, Thomson Reuters terminated ten CLEAR subscriber accounts; concluded that twelve of the subscribers had not misused CLEAR; and secured new attestations of compliance from the other twenty-four subscribers. (*Id.*).

In November 2014, Kidd applied for a job as an Immunization Program Consultant with the GaDPH and agreed in writing to submit to a "criminal history and background check." (Pl.'s SOF ¶ 76). Kidd received word from GaDPH that she was the top candidate for the position and was given an expected start date. (Pl.'s SOF ¶¶ 77, 78). On November 10, 2014, however, GaDPH obtained a "National Comprehensive Report" through CLEAR, which included criminal history information purportedly about Kidd (in addition to her date of birth, social security number, and information on her professional license status). (*Id.* ¶¶ 14, 94-95). Most significant for present purposes, the report stated that Kidd was divorced and that she had been convicted of a crime in Baltimore, Maryland — both of which were inaccurate. (*Id.* ¶¶ 95, 96). On December 16, 2014, a GaDPH representative advised Kidd that there was a problem with her application because a criminal case had appeared on her background check. (*Id.* ¶ 79). Kidd did not obtain access to the CLEAR results until after she hired an attorney; in the meantime, the possibility of a job at GaDPH disappeared. (*Id.* ¶¶ 82, 88, 91-92). Kidd allegedly could not find another suitable job until April 2016. (*Id.* ¶ 93; Docket No. 64).

On March 4, 2016, Kidd filed putative class action against Thomson Reuters, alleging violations of the FCRA. (Docket No. 1 ("Compl.")). At the initial pretrial conference, the parties proposed, and the Court agreed, to bifurcate the case, with a first phase limited to

discovery on the threshold issues of whether Thomson Reuters is a "consumer reporting agency," as defined in Title 15, United States Code, Section 1681a(f), and whether CLEAR reports are "consumer report[s]," as defined in Title 15, United States Code, Section 1681a(d)(1). (Docket No. 19, at 2; Docket No. 27). Thomson Reuters now moves for summary judgment.

## THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor can the non-moving party "defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or

on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## DISCUSSION

"The FCRA protects consumers with regard to the collection and dissemination of personal information collected by consumer reporting agencies." *Ernst v. Dish Network, LLC*, 49 F. Supp. 3d 377, 381 (S.D.N.Y. 2014). Significantly, by its terms, the statute applies only to a "consumer reporting agency" (or "CRA"), which is defined, in relevant part, as any person or entity "which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling . . . information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). A CRA, therefore, is defined in part by reference to a "consumer report." Rather unhelpfully, however, "consumer report" is defined, circularly, by reference to the definition of a CRA. *See* 15 U.S.C. § 1681a(d)(1). That is, the statute defines "consumer report," in relevant part, as the "communication of any information *by a consumer reporting agency* bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" various purposes, including employment. *Id.* (emphasis added).

In interpreting a statute, a court "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. DiCristina,* 726 F.3d 92, 96 (2d Cir. 2013). Doing so here, the Court concludes that whether Thomson Reuters qualifies as a CRA turns in the first instance on whether its subjective purpose in assembling information concerning consumers is to furnish

consumer reports to third parties. That is because an entity qualifies as a CRA only if it "regularly" assembles information on consumers "*for the purpose of* furnishing consumer reports to third parties," and "purpose" means "[t]he reason for which something is done or created or for which something exists" or to "[h]ave as one's intention or objective," OXFORD ENGLISH ONLINE DICTIONARY, https://en.oxforddictionaries.com/definition/purpose (last visited October 25, 2017); *see* MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/purpose (last visited October 25, 2017) (defining "purpose" as "something set up as an object or end to be attained" or "intention"). By its plain terms, therefore, the statute applies only to a person or entity that regularly assembles consumer information with a particular purpose or subjective intention — namely, of providing it to third parties for use (actual or expected) in connection with an FCRA-regulated end, such as employment eligibility.

Notably, that conclusion is consistent with the approach taken by courts in other Circuits, which have looked to the subjective intent of defendants in determining whether they qualified as CRAs under the FCRA. In *Liberi v. Taitz*, No. 11-CV-0485 (AJG), 2012 WL 10919114 (C.D. Cal. Mar. 16, 2012), for example, the Court concluded that the defendant, which operated a public records search engine similar to CLEAR, was not a CRA because, among other things, it had "established that it did not *intend* the Background Reports [it issued] to be credit reports." *Id.* at *6 (emphasis added). By contrast, the court in *Lewis v. Ohio Professional Electronic Network LLC*, 190 F. Supp. 2d 1049 (S.D. Ohio 2002), concluded that the defendant was a CRA because it "knew and in fact intended for parties such as potential employers and insurance companies to access the public arrest data information, and that the information might be used in employment and other decisions." *Id.* at 1058. And finally, in *Mangum v. Action Collection Service Inc.*, No. 05-CV-507 (BLW), 2007 WL 1959076 (D. Idaho July 3, 2007), *aff'd in part,*

*rev'd in part*, 575 F.3d 935 (9th Cir. 2009), the court looked to the defendants' subjective "business purpose" in deciding whether they were CRAs. "There is simply nothing in the record," the Court concluded, "suggesting that [the defendants] assemble[d] or evaluate[d] consumer information for any other purpose than to collect debt on behalf of their clients — the true business purpose of a collection agency. Accordingly, the Court finds that [the defendants] are not 'consumer reporting agencies' for purposes of the FCRA." *Id.* at *4; *cf. Houghton v. N.J. Mfrs. Ins. Co.,* 795 F. 2d 1144, 1148 (3d Cir. 1986) (finding no FCRA violation when there was no indication "that [defendant] desired a report on [plaintiff] for a purpose encompassed within the statutory definition of an investigative consumer report").

More broadly, reading the definition of CRA to turn on the relevant entity's subjective intentions is consistent with approaches of the Second Circuit and other courts of appeal to similar language in other statutes. In *United States v. Tarantino*, 617 F. App'x 62 (2d Cir. 2015) (summary order), for example, the Second Circuit assessed the statutory prohibition on interception of communications "*for the purpose of* committing any criminal or tortious act," set forth in Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. § 2511(2)(d) (emphasis added). The Court held that the defendant's associate did not violate that prohibition, even though he later used the recording at issue for blackmail, because "it is far from clear that blackmail was his 'primary motivation' or 'a determinative factor' at the time he made the recording." 617 F. App'x at 65; *see Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010) (holding "that a cause of action under § 2511(2)(d) requires that the interceptor *intend* to commit a crime or tort independent of the act of recording itself" (emphasis added)); *see also, e.g.*, *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 491, 497 (D.C. Cir. 2016) (upholding a Federal Election Commission regulation requiring disclosure of donations only if they were

7

"made *for the purpose of* further electioneering communications," noting that the "purpose requirement" served to exclude those who donated without the requisite subjective intent); *Ramos v. INS*, 246 F.3d 1264, 1266 (9th Cir. 2001) (construing an immigration statute that precluded an applicant from establishing "good moral character" if he or she gave "false testimony for the purpose of obtaining benefits under this chapter" to require "subjective intent to deceive for the purpose of obtaining immigration benefits").

Conspicuously, Kidd fails to cite even one case holding that an entity's subjective intent is irrelevant to the question of whether it is a CRA under the FCRA.[1] Instead, Kidd's principal statutory argument is that the Court should begin with the definition of "consumer report" and work backwards to determine if Thomson Reuters is a CRA. That is, Kidd argues that searches of CLEAR generate consumer reports because they are used (and, by extension, expected to be used), in at least some instances, for FCRA-regulated ends and that, whatever its subjective intent, Thomson Reuters is therefore a CRA because it assembles the information in CLEAR. (*See* Pl.'s Opp'n 1-4; *see also id.* at 12 ("The key inquiry in this case, therefore, is not whether Defendant thinks it's a CRA, but whether CLEAR reports are consumer reports.")). But that argument ignores the fact that information qualifies as a "consumer report" in the first instance only if it was communicated "by a consumer reporting agency." 15 U.S.C. § 1681a(d)(1); *see also, e.g.*, *Sweet v. LinkedIn Corp.*, No. 14-CV-04531 (PSG), 2015 WL 1744254, at *6 (N.D.

---

[1] In a supplemental submission, Kidd noted a recent decision by the United States District Court for the District of New Hampshire denying a motion by Thomson Reuters to dismiss claims under the FCRA. (Docket No. 74 (citing *Landry v. Time Warner Cable, Inc., & Thomson Reuters Corp.*, No. 16-CV-507 (SM), 2017 WL 3444825 (D.N.H. Aug. 9, 2017)). That decision has no relevance here, however, as it did not address the statutory definition of CRA, let alone whether there is evidence to conclude that Thomson Reuters meets the definition (perhaps because, arising on a motion to dismiss, the Court was obliged to accept as true the facts alleged in the complaint). *See* 2017 WL 3444825, at *1-3.

Cal. Apr. 14, 2015) ("To meet the definition of a consumer report, a communication must be made 'by a consumer report[ing] agency.'"); FED. TRADE COMM'N, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT, 2011 WL 3020575 (F.T.C.), at *13 (the "FTC 40 YEARS FCRA REPORT") ("Information is not a 'consumer report' if the person furnishing the information is not a 'consumer reporting agency.'"). In addition, Kidd's construction would subject entities to coverage under the statute based solely on the intentions of isolated *users*, thereby reading the phrase "for the purpose of" out of the statute and violating the cardinal rule of statutory construction that courts should read statutes "so as to give effect, if possible, to every clause and word of a statute." *In re Barnet*, 737 F.3d 238, 247 (2d Cir. 2013) (internal quotation marks omitted).

The premise of Kidd's argument — that consumer information automatically qualifies as a "consumer report" if it is used for FCRA purposes — is also inconsistent with the views of the Federal Trade Commission ("FTC"), which are arguably entitled to deference (and, in any event, are compelling in their own right). *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Sweet*, 2015 WL 1744254, at *5 n.59 (observing that the FTC 40 YEARS FCRA REPORT "provide[s] persuasive guidance from the agency charged with enforcing and interpreting the FCRA"). Specifically, the FTC has explained that "[i]f the entity supplying the report has taken reasonable steps to insure that the report is not used for [an FCRA-regulated] purpose, and if it neither knows of, nor can reasonably anticipate such use, the report should not be deemed a consumer report by virtue of uses beyond the entity's control." FTC 40 YEARS FCRA REPORT, 2011 WL 3020575, at *16; *see also* Commentary on the Fair Credit Reporting Act, 55 Fed. Reg. 18,804 (May 4, 1990) (noting that a publisher of public records information does not qualify as a CRA "simply because some" of the information "might be used by an occasional subscriber for

9

purposes" within the scope of the FCRA); Fair Credit Reporting Act: Statements of General Policy or Interpretation, 53 Fed. Reg. 29,696, 29,697 (Aug. 8, 1988) (noting that "a claims reporting service should not be deemed a consumer reporting agency because of an occurrence beyond its control — a unilateral use decision by the insurer to which it provides a claims report"). "The entity supplying the report might establish that it does not reasonably anticipate" such misuse "by requiring the recipient to certify that the report will not be used to determine eligibility for a permissible purpose, by auditing report recipients for compliance, and by taking appropriate action against those who violate such certifications." FTC 40 YEARS FCRA REPORT, 2011 WL 3020575, at *16.

None of that is to say that an entity can avoid being treated as a CRA merely by declaring that its purpose is not to provide information for FCRA-regulated purposes. Put another way, disclaimers alone are not enough for an entity that otherwise qualifies as a CRA to avoid the reach of the statute. *See, e.g.*, *Adams v. LexisNexis Risk & Info. Analytics Grp., Inc.*, No. 08-CV-4708 (RMB) (KW), 2010 WL 1931135, at *7 n.6 (D.N.J. May 12, 2010) (holding that the defendant could not escape liability under the FCRA based solely on language accompanying its report stating that the "data is not permitted to be used" for FCRA purposes); *see also* Tony Rodriguez & Jessica Lyon, *Background Screening Reports and the FCRA: Just Saying You're Not a Consumer Reporting Agency Isn't Enough*, FTC BUSINESS BLOG (Jan. 10, 2013, 2:00 p.m.), https://www.ftc.gov/news-events/blogs/business-blog/2013/01/background-screening-reports-fcra-just-saying-youre-not ("If a company meets the legal definition of a 'consumer reporting agency,' it's a consumer reporting agency. Including a disclaimer that says, in effect, 'But we're not a CRA!' won't change that.); *see also id.* (noting that a company that advertised access to "hundreds of thousands of criminal records" for the purpose of "conduct[ing] searches

on potential employees as part of the hiring process" was a CRA despite a disclaimer stating that the information could not be used for FCRA-related purposes). Instead, a court must look to the totality of circumstances — in particular, to the actual "activities of [the] company" — to determine whether it regularly assembles information "for the purpose of regularly furnishing 'consumer reports' to third parties." FTC, Advisory Opinion to LeBlanc (June 9, 1998), *available at* http://www.ftc.gov/os/statutes/fcra/leblanc.shtm.

Here, the totality of the circumstances compels the Court to conclude that Thomson Reuters is not a CRA. That is, all of the evidence in the record demonstrates that Thomson Reuters "did not intend" the reports generated by CLEAR subscribers "to be credit reports." *Liberi*, 2012 WL 10919114, at *6. Indeed, Thomson Reuters takes affirmative steps — through both words and actions — at every stage of the customer acquisition, application, contracting, and support processes to ensure that subscribers are not using CLEAR for FCRA-regulated purposes. (*See* Def.'s SOF ¶¶ 21-68). For instance, it trains and tests its employees on prohibited uses for CLEAR, (*id.* ¶¶ 22-32); it includes admonitions and disclaimers on its marketing materials, (*id.* ¶¶ 33-38); it requires its subscribers to agree in writing to not use CLEAR for prohibited purposes, (*id.* ¶¶ 40-42); it mandates that all subscribers complete a certification process, (*id.* ¶¶ 45-51); it vets its customers before providing them access to the platform through a credentialing process, (*id.* ¶¶ 52-56); it requires all subscribers to verify the continuing accuracy of their certifications every two years, (*id.* ¶ 58); it instructs employees to report any misuse, (*id.* ¶¶ 62-64); and it sets out methodical remediation procedures to weed out those abusing the platform, (*id.* ¶¶ 62-68). By contrast, there is no evidence in the record that, in making the CLEAR platform available to its subscribers, Thomson Reuters assembled information on consumers with the subjective intention of supplying "consumer reports."

11

Kidd points to the fact that Thomson Reuters investigated forty-six instances of suspected subscriber misuse as evidence that the company knew that CLEAR would be used for FRCA purposes. (*See* Pl.'s Opp'n 10-11). That number, however, is miniscule when compared to the number of CLEAR subscribers (more than 80,000) and searches (more than 100,000 per day) (*see* Def.'s SOF ¶¶ 7, 13), and thus falls far short of establishing that Thomson Reuters "regularly" assembles information for the purpose of furnishing consumer reports to third parties, as required to fall within the definition of a CRA. 15 U.S.C. § 1681a(f); *see, e.g.*, *Rugg v. HANAC Inc.*, No. 01-CV-9481 (BSJ), 2002 WL 31132883, at *3 (S.D.N.Y. Sept. 26, 2002) (concluding that "isolated instances" of investigations being used for employment purposes cannot form the basis of a claim that an entity "regularly engages" in FCRA-covered conduct); *Johnson v. Fed. Express Corp.*, 147 F. Supp. 2d 1268, 1275 (M.D. Ala. 2001) (construing the term "regularly engages" to require that an entity "provide consumer reports as part of [its] usual, customary, and general course of business if [it] is to qualify as a 'consumer reporting agency' under the FCRA"). Moreover, in every instance of suspected misuse, Thomson Reuters investigated the conduct and either found no actual abuse or took some form of remedial action. (Def.'s SOF ¶¶ 64, 68). Far from supporting Kidd's argument, therefore, this evidence supports the conclusion that Thomson Reuters has taken meaningful steps to prevent — and thus does not intend — the use of its platform for FCRA-regulated purposes. *See Liberi*, 2012 WL 10919114, at *7 ("Here, Plaintiffs' *own* evidence confirms that Intelius did not intend the Background Reports to be governed by the FCRA.").

Finally, Kidd cites a statement by Thomson Reuters in a single CLEAR marketing brochure — namely, that subscribers can use the platform to "investigate potential clients, employees and other parties," (Docket No. 58, Ex. K) — as evidence that the company

12

subjectively intended for CLEAR to be used for FCRA-regulated purposes. (*See* Pl's Opp'n 5, 10, 18, 23). In doing so, however, Kidd takes the statement out of context. The very next sentence of the brochure states that CLEAR "shows graphical connections between people, addresses, and phone numbers *to help you verify a person's identity*," (Docket No. 58, Ex. K (emphasis added)), a purpose that does not fall within the scope of the FCRA. *See* 15 U.S.C. § 1681a(d)(1); *see also* FED. TRADE COMM'N, DATA BROKERS: A CALL FOR TRANSPARENCY AND ACCOUNTABILITY 53 (2014) (distinguishing between FCRA-regulated products and products intended merely "to confirm [an individual's] identity"), *available at* https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf. Additionally, at its bottom, the brochure states that "[t]he data provided to you by CLEAR may not be used as a factor in establishing a consumer's eligibility for . . . employment purposes or for any other purpose authorized under the FCRA." (Docket No. 58, Ex. K). In the face of the many controls Thomson Reuters has put in place to ensure that CLEAR is not used for any FCRA-regulated purposes, no reasonable jury could rely on that one document (of the hundreds of marketing materials in the record, no less) to find that the company "regularly" assembles information "for the purpose" of providing "consumer reports" to third parties. It follows that Thomson Reuters is not a CRA and is entitled to summary judgment on all of Kidd's claims.

## CONCLUSION

For the foregoing reasons, Thomson Reuters's motion for summary judgment is GRANTED, and all of Kidd's claims are dismissed.[2] One issue remains: Both parties' submitted

---

[2] The Court need not, and does not, reach Defendant's motion to preclude Plaintiff's proposed expert witness, Brian H. Kleiner. (Docket No. 65).

briefs or exhibits that were either under seal or partially redacted. (*See* Docket Nos. 52, 59). Upon review, the Court finds that Docket Nos. 51-2 through 51-4 are "proprietary, confidential, and commercially sensitive internal training materials" of Thomson Reuters, (Docket No. 52), and, thus, may remain under seal. *See, e.g.*, *Tropical Sails Corp. v. Yext, Inc.*, No. 14-CV-7582 (JFK), 2016 WL 1451548, at *4 (S.D.N.Y. Apr. 12, 2016) (granting a motion to redact documents "relating to marketing and business development activities [such] as sales training materials, internal marketing strategies, company marketing plans, and internal emails regarding marketing tests"). To the extent that either party believes that other papers should remain sealed or redacted, however, counsel shall file a letter brief, not to exceed five pages, **within two weeks of this Opinion and Order**, addressing the propriety of doing so. *See, e.g.*, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006) (discussing the presumption in favor of public access); *see also, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015) ("[T]he mere fact that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome the presumption in favor of public access to judicial documents." (citing cases)). If no party files a brief justifying the maintenance of a particular document in sealed or redacted form, the relevant party shall publicly file an unredacted version of the document on ECF **within two business days** of the letter-brief deadline.

The Clerk of Court is directed to terminate Docket Nos. 47 and 65 and to close the case.

SO ORDERED.

Dated: October 26, 2017
      New York, New York

JESSE M. FURMAN
United States District Judge