17-3550
Kidd v. Thomson Reuters Corp.

# In the
# United States Court of Appeals
## For the Second Circuit

––––––––––––––––––––––

August Term, 2018
No. 17-3550

LINDSEY A. KIDD,
*Plaintiff-Appellant*,

*v.*

THOMSON REUTERS CORPORATION,
*Defendant-Appellee.*

––––––––––––––––––––––

Appeal from the United States District Court
for the Southern District of New York.
No. 16-1668 — Jesse M. Furman, *Judge.*

ARGUED: FEBRUARY 4, 2019
DECIDED: MAY 30, 2019

––––––––––––––––––––––

Before: CALABRESI, DRONEY, *Circuit Judges*, and UNDERHILL, *Chief District Judge.**

––––––––––––––––––––––

---

* Judge Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

1    Appeal from a judgment of the United States District Court for
2    the Southern District of New York following the grant of Defendant-
3    Appellee Thomson Reuters' motion for summary judgment. We hold
4    that the district court was correct in concluding that Thomson Reuters
5    is not a "consumer reporting agency," 15 U.S.C. § 1681a(f), and
6    therefore is not subject to the Federal Consumer Reporting Act.
7    Accordingly, we AFFIRM the district court's judgment.
8
9
10    JAMES A. FRANCIS, Francis &
11    Mailman, Philadelphia, PA, *for*
12    *Appellant*.
13
14    KEVIN KING (Eric C. Bosset & Neil K.
15    Roman, *on the brief*), Covington &
16    Burling, Washington, D.C., *for*
17    *Appellee*.
18
19  DRONEY, *Circuit Judge*:

20    Plaintiff-Appellant Lindsey A. Kidd was the subject of a

21  background check as part of an employment application process with

22  the state of Georgia Department of Health ("Department"). The

23  background check was performed using Defendant-Appellee

24  Thomson Reuters' subscription-based internet platform, "CLEAR."

25  The CLEAR report obtained by the Department falsely showed that

26  Kidd had been previously convicted of theft. Believing the report to

27  be correct, the Department rejected Kidd's application. Kidd then

1  filed this action in the Southern District of New York, alleging that

2  Thomson Reuters is a "consumer reporting agency" subject to the Fair

3  Credit Reporting Act and that it violated that act by providing the

4  false report. After the conclusion of discovery, the district court

5  (Furman, *J.*) granted Thomson Reuters' motion for summary

6  judgment, concluding that because Thomson Reuters is not a

7  "consumer reporting agency," it is not subject to the Act. For the

8  reasons that follow, we AFFIRM the district court's judgment in favor

9  of Thomson Reuters.

10                                          I.

11

12        The Fair Credit Reporting Act ("FCRA") regulates, among

13  other things, the circumstances in which a "consumer reporting

14  agency" may furnish "consumer reports" to third parties, and the

15  information contained in those reports. 15 U.S.C. §§ 1681b, 1681c.

16  Typically, consumer reporting agencies sell consumer reports to

17  lenders, credit card companies, insurers, and employers for credit,

18  insurance, and employment decisions.    CONSUMER FINANCIAL

19  PROTECTION BUREAU, LIST OF CONSUMER REPORTING COMPANIES, 3

1    (2019), https://www.consumerfinance.gov/consumer-tools/credit-

2    reports-and-scores/consumer-reporting-companies/companies-list/

3    (last visited Apr. 23, 2019). Examples of government-designated

4    consumer reporting agencies are Equifax, Transunion, and Experian.

5    *Id.* at 8. If a "consumer reporting agency" fails to comply with the

6    Act, it may be subject to civil liability to consumers, which includes

7    actual and punitive damages. 15 U.S.C. §§ 1681n, 1681o. This appeal

8    turns on whether Thomson Reuters qualifies as a "consumer

9    reporting agency" under the Act.

10                        A.[1]

11        Thomson Reuters operates an online research platform named

12    "Consolidated Lead Evaluation and Reporting," or "CLEAR," that

13    provides its subscribers summary reports of motor vehicle records,

14    court records, aliases, the status of professional licenses, real property

15    transactions, and similar information.[2] CLEAR subscribers are

---

[1] The following facts are undisputed and taken from the parties' summary judgment submissions.

[2] Although Thomson Reuters maintains that it is not subject to the FCRA, it acknowledges that it is regulated by the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.*, the Drivers' Privacy Protection Act, 18 U.S.C. § 2721 *et seq.*, and state voter-identification laws. These statutes are not relevant to the parties' dispute, however.

1    principally government agencies and law enforcement entities, but

2    also include financial institutions, corporate security offices, and

3    insurance claims departments. The platform receives approximately

4    100,000 search queries each day and is designed to help combat fraud

5    and assist public agencies in criminal investigations.

6        Thomson Reuters prohibits its subscribers from utilizing

7    CLEAR for any purpose covered by the FCRA, such as credit inquiries

8    or background checks related to employment, and has established

9    measures to prevent those uses of its reports. For example, the

10   company markets CLEAR for law enforcement, fraud prevention, or

11   identity verification purposes only. Employees tasked with

12   marketing CLEAR to potential subscribers are trained that CLEAR

13   "may not be promoted or used for FCRA-regulated purposes." App'x

14   at 141.

15       Thomson Reuters also screens potential subscribers before

16   granting them access to CLEAR. They are required to indicate how

17   they intend to use the platform on an "Account Validation and

18   Credentialing" form, which Thomson Reuters employees then review

1    to confirm that the use of CLEAR is not for an FCRA purpose. If an

2    employee suspects an applicant intends to use the platform for an

3    improper purpose, the applicant will be flagged for review by a

4    "Credentialing Committee" that may reject the applicant or require

5    the applicant to affirm she will not improperly use CLEAR. Once

6    approved, the customer enters into a contract with Thomson Reuters

7    in which she specifically represents that she will not use CLEAR for a

8    purpose covered by the FCRA. Thomson Reuters "offers

9    complimentary training to new CLEAR subscribers" to ensure

10   compliance. App'x at 145. Every two years, Thomson Reuters requires

11   subscribers to reaffirm their commitment to using CLEAR for a non-

12   FCRA purpose, and before a subscriber may enter an individual

13   search request, she must verify that her search is for an approved

14   purpose.

15        Thomson Reuters also investigates reports of CLEAR misuse

16   through its in-house compliance office. If the office determines misuse

17   has occurred it will "remind[] the subscriber that FCRA use of CLEAR

18   is prohibited and require[] the subscriber to provide a written

1  'attestation' of its authorized uses of CLEAR and its intent to enforce

2  the subscriber's contractual obligation not to use CLEAR for any

3  FCRA purpose." App'x at 146. It is undisputed that reports of misuse

4  are rare. Of the 144 million CLEAR searches conducted between 2012

5  and 2016, only 46 were alleged to be for an FCRA purpose.[3]  Thomson

6  Reuters determined that 12 of the 46 reports did not involve misuse,

7  required the users responsible for 24 of the searches to reaffirm their

8  promise to perform non-FCRA searches, and terminated the accounts

9  of the subscribers responsible for the remaining 10 improper searches.

10                                        B.

11         This case involves one of those 46 reports of misuse. In

12  November 2014, Plaintiff-Appellant Lindsey Kidd was the leading

13  candidate for a position as an "Immunization Program Consultant"

14  with the Georgia Department of Public Health, a CLEAR subscriber.

15  The Department received Kidd's authorization to obtain a

16  background check during the application process. Using the CLEAR

17  platform, the Department discovered that Kidd had a prior state

---

[3] This reflects only *reported* misuses of the platform.

1    conviction for theft. Although the Department regarded Kidd as the

2    "top candidate" for the position, the report led the Department not to

3    hire her. But Kidd had not been convicted of theft; the CLEAR report

4    contained false information. Kidd was not able to correct the mistake

5    in the report in time to obtain the position.

6          Kidd subsequently filed a putative class action complaint in the

7    Southern District of New York against Thomson Reuters in March

8    2016, alleging that operating the CLEAR platform renders Thomson

9    Reuters a "consumer reporting agency" under the FCRA and that the

10   company violated several provisions of the Act in providing false

11   information to the Georgia agency.

12         After the conclusion of discovery, the district court granted

13   summary judgment in favor of Thomson Reuters. Starting with the

14   text of the FCRA, the district court determined that an entity is a

15   "consumer reporting agency" under the Act if it "regularly assembles

16   consumer information with a particular purpose or subjective

17   intention—namely, of providing it to third parties for use (actual or

18   expected) in connection with an FCRA-regulated end, such as

8

1   employment eligibility." *Kidd v. Thomson Reuters Corp.,* 299 F. Supp.

2   3d 400, 404 (S.D.N.Y. 2017). "That is because," the court explained,

3   "an entity qualifies as a [consumer reporting agency] only if it

4   'regularly' assembles information on consumers '*for the purpose of*

5   furnishing consumer reports to third parties,' and 'purpose' means

6   '[t]he reason for which something is done or created or for which

7   something exists' or to '[h]ave as one's intention or objective.'" *Id.*

8   (quoting *Purpose*, OXFORD ENGLISH ONLINE DICTIONARY,

9   https://en.oxforddictionaries.com/definition/purpose).

10         Applying that definition to Thomson Reuters, the district court

11   determined that the company does not qualify as a "consumer

12   reporting agency" because Thomson Reuters did not intend to furnish

13   "consumer reports" through the CLEAR platform. The court

14   explained that Thomson Reuters took "affirmative steps . . . at every

15   stage of the customer acquisition, application, contracting, and

16   support processes to ensure that subscribers are not using CLEAR for

17   FCRA-regulated purposes," thereby establishing that it did not

1    intend to furnish reports for FCRA purposes. Thus, its reports would

2    not constitute "consumer reports." *Id.* at 407.

3    　　　Kidd timely appealed from the district court's judgment.

4    　　　　　　　　　　　　　II.

5    　　　We review a "district court's grant of a motion for summary

6    judgment de novo, construing the evidence in the light most favorable

7    to the non-moving party." *Irby v. N.Y.C. Transit Auth.*, 262 F.3d 412,

8    413 (2d Cir. 2001) (internal quotation marks omitted).

9    　　　Kidd's appeal presents a question of first impression for us:

10   Whether, to qualify as a "consumer reporting agency" under the

11   FCRA, an entity must specifically intend to furnish a "consumer

12   report." For the reasons that follow, we conclude that it must have

13   such an intent, and we affirm the district court's order granting

14   summary judgment in favor of Thomson Reuters.

15   　　　　　　　　　　　　　A.

16   　　　To answer questions of statutory interpretation, we "begin with

17   the text." *Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 741 (2017).

18   　　　Under the Act, a "consumer reporting agency" is:

10

1    any person[4] which, for monetary fees, dues, or on a
2    cooperative nonprofit basis, regularly engages in whole
3    or in part in the practice of assembling or evaluating
4    consumer credit information or other information on
5    consumers *for the purpose* of furnishing *consumer reports*
6    to third parties, and which uses any means or facility of
7    interstate commerce for the purpose of preparing or
8    furnishing consumer reports.

9

10   15 U.S.C. § 1681a(f) (emphasis added). The Act defines a "consumer

11   report" as:

12    any written, oral, or other communication of any
13    information by a consumer reporting agency bearing on
14    a consumer's credit worthiness, credit standing, credit
15    capacity, character, general reputation, personal
16    characteristics, or mode of living which is used or
17    expected to be used or collected in whole or in part for
18    the purpose of serving as a factor in establishing the
19    consumer's eligibility for—(A) credit or insurance to be
20    used primarily for personal, family or household
21    purposes; (B) employment purposes; or (C) any other
22    purpose authorized under section 1681b of this title.

23

24   15 U.S.C. § 1681a(d)(1).[5] Thus, the principal uses of "consumer

25   reports" are for determining eligibility of consumers for extensions of

26   credit, providing insurance, or reviewing employment applications.

---

[4] Under the Act, "person" includes individuals and corporate entities. 15 U.S.C. § 1681a(b).

[5] Section 1681b enumerates the permissible purposes to which a "consumer report" may be put under the FCRA. Those purposes include credit inquiries and employment purposes. *See* 15 U.S.C. § 1681b.

1      The ordinary meaning of "'purpose' corresponds loosely with

2    the common-law concept of specific intent."[6] *United States v. Bailey*,

3    444 U.S. 394, 405 (1980); *cf. United States v. Technodyne LLC*, 753 F.3d

4    368, 383 (2d Cir. 2014) (finding, in the civil context, that the phrase "in

5    order to" constitutes a specific intent requirement). Specific intent

6    may be found where a person acts with "[t]he intent to accomplish

7    the precise . . . act." *Specific Intent*, BLACK'S LAW DICTIONARY (10th ed.

8    2014).[7] Thus, "a person who causes a particular result is said to act

9    purpose[ly] if 'he consciously desires that result, whatever the

10   likelihood of that result happening from his conduct.'" *Bailey*, 444 U.S.

11   at 404 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 445

12   (1978)). This understanding comports with the common dictionary

13   definition of "purpose" as "something set up as an object or end to be

---

[6] "When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

[7] "Corporate intent is shown by the actions and statements of the officers, directors, and employees who are in positions of authority or have apparent authority to make policy for the corporation." *District Lodge 26, Intern. Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 53 (2d Cir. 2010) (quoting *United States v. Basic Constr. Co.*, 711 F.2d 570, 573 (4th Cir. 1983) (alteration omitted)).

1    attained." Purpose, MERRIAM-WEBSTER ONLINE DICTIONARY,

2    https://www.merriam-webster.com/dictionary/purpose (last visited

3    March 21, 2019).

4        The meaning of "for the purpose of" in § 1681a(f) is therefore

5    plain: A "consumer reporting agency" is an entity that intends the

6    information it furnishes to constitute a "consumer report." *See*

7    *Williams v. Wilmington Trust Co.*, 345 F.3d 128, 133 (2d Cir. 2003)

8    ("[W]hen Congress uses in a statute a term of art with a long history

9    of judicial interpretation, we must presume that Congress intends to

10    use the word in its technical sense."). Such purpose can, of course, be

11    established in all the ways intent can be found in our law, including

12    explicit attestation, concrete evidence, or, in some circumstances,

13    inference from the foreseeable and logical consequences of a course

14    of conduct.

15        We have interpreted the same phrase in other statutes to

16    describe a specific intent requirement. Section 2511(2)(d) of Title 18,

17    for example, prohibits the interception of communications "*for the*

18    *purpose of* committing any criminal or tortious act." (emphasis added).

1    We held in *Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010), "that a cause

2    of action under § 2511(2)(d) requires that the interceptor *intend* to

3    commit a crime or tort independent of the act of recording itself." 618

4    F.3d at 100 (emphasis added); *see also United States v. Tarantino*, 617 F.

5    App'x 62, 65 (2d Cir. 2015) (summary order) (finding that § 2511(2)(d)

6    did not apply to defendant because it was not clear that a crime was

7    his "primary motivation" or the "determinative factor" in his

8    intercepting of communications).

9        Other circuits have also concluded that the FCRA includes a

10   specific intent requirement in its definition of a "consumer reporting

11   agency." In *Zabriskie v. Fed. Nat'l Mortg. Assoc.*, 912 F.3d 1192 (9th Cir.

12   2019), for example, lenders providing mortgage refinancing used a

13   Fannie Mae computer program called "Desktop Underwriter"—a

14   platform used to determine a loan's eligibility for purchase by Fannie

15   Mae—to evaluate the plaintiffs' loan application. 912 F.3d at 1195-96.

16   The program, however, incorrectly reported that the plaintiffs had

17   been the subject of a recent foreclosure, and the lenders rejected the

18   plaintiffs' application as a result. *Id.* at 1196. The plaintiffs then sued

14

1    Fannie Mae under the FCRA.  *Id.* Fannie Mae argued that it was not a

2    "consumer reporting agency," and therefore not liable under the Act,

3    because it did not provide Desktop Underwriter for the purpose of

4    furnishing a consumer report about prospective borrowers to lenders,

5    but rather for the purpose of facilitating "a transaction between the

6    lender and Fannie Mae." *Id.* at 1199 (internal quotation marks

7    omitted). The Ninth Circuit agreed, explaining that "'[p]urpose'

8    means 'something set up as an object or end to be attained'" and

9    accordingly, "[b]y its plain meaning, . . . the FCRA applies only to an

10   entity that assembles or evaluates with the intent of providing a

11   consumer report to third parties." *Id.* (internal quotation marks and

12   citation omitted).

13       The Seventh Circuit has reached a similar conclusion. In *Tierney*

14   *v. Advocate Health & Hosps. Corp.*, 797 F.3d 449 (7th Cir. 2015), a

15   number of computers containing unencrypted patient data were

16   stolen from the defendant-hospital's administrative offices. 797 F.3d

17   at 450. Several patients sued the defendant, claiming that the release

18   of their records violated the FCRA, which requires that "consumer

15

1    reporting agencies" employ procedures to prevent disclosures of

2    consumer information to unauthorized third parties. *Id.* at 451. The

3    Seventh Circuit concluded, however, that the plaintiffs failed to state

4    a claim under the FCRA because the patients' information was

5    collected to obtain payments from medical insurers and government

6    agencies and not assembled for the purpose of furnishing consumer

7    reports. *Id.* at 452. Therefore, the court explained, the defendant-

8    hospital was not a "consumer reporting agency" under the Act. *Id.* at

9    453.

10    Finally, our interpretation of the FCRA accords with 2010

11    guidance provided by the Federal Trade Commission.[8] In examples

12    meant to illustrate the meaning of "for the purpose of furnishing

13    consumer reports to third parties," the FTC guidance indicates that

14    an entity is not a "consumer reporting agency" unless it possesses the

15    specific intent to provide a "consumer report." *See* FED. TRADE

---

[8] The Consumer Protection Act of 2010 transferred authority from the FTC "to prescribe rules" or "issue guidelines" regarding the FCRA to the Consumer Financial Protection Bureau. 12 U.S.C. § 5581(b)(5)(A), (B)(i); 15 U.S.C. § 1681s(e)(1). Nevertheless, the FTC retains authority to enforce the FCRA. 12 U.S.C. § 5581(b)(5)(C)(i); 15 U.S.C. § 1681s(a)(1).

1    COMM'N, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING

2    ACT, 2011 WL 3020575 at *23 (2011). Although the FTC's guidance is

3    given no more than persuasive deference, *see Skidmore v. Swift & Co.*,

4    323 U.S. 134, 140 (1944), we find that it is helpful and, as it tracks the

5    language of the statute, persuasive.

6        In sum, "[t]he statute says what it says," *Cyan, Inc. v. Beaver*

7    *Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1069 (2018)—a "consumer

8    reporting agency" is an entity that assembles consumer information

9    "for the purpose of furnishing consumer reports to third parties."

10                                  B.

11        Kidd's arguments to the contrary are unavailing. Starting with

12    the text, she argues that an entity qualifies as a "consumer reporting

13    agency" if it "assembles consumer information in order to sell reports

14    which satisfy the statutory definition of 'consumer report,'" whether

15    or not the entity actually intended to furnish a "consumer report."

16    Appellant's Br. at 13. Kidd suggests section 1681a(f) imposes

17    something akin to a general intent requirement—an entity need not

18    specifically intend to furnish a "consumer report" to be a "consumer

17

1 reporting agency." Rather, in Kidd's view, the Act merely requires

2 that an entity intend to furnish a report (consumer or otherwise) that

3 ultimately constitutes a "consumer report."

4      Kidd's interpretation, however, finds no support in the text. As

5 explained above, the long-standing meaning of "for the purpose of,"

6 which we presume Congress understood when it drafted the FCRA,

7 *see Williams*, 345 F.3d at 133, requires specific intent to provide a

8 statutorily-defined "consumer report," *Bailey*, 444 U.S. at 405. Most

9 naturally read, then, "for the purpose of furnishing consumer reports

10 to third parties" means an entity must act with the specific intent to

11 supply such a report.[9]

12      Next, Kidd warns that if we adopt Thomson Reuters'

13 interpretation we "would permit a company to purpose[ly] gather

14 consumer information and intentionally sell person-specific reports

15 to third parties, which in all ways meet the statutory definition of

---

[9] Congress could have achieved the result suggested by Kidd by drafting section 1681a(f) to read "for the purpose of furnishing *reports that constitute 'consumer reports regardless of the intent for which the report was provided*.'" But the statute does not include this language, and we may not "add words to the law to produce what is thought to be a desirable result." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015). Our interpretation must conform to the language of the statute.

1    'consumer report,' yet avoid the reach of the FCRA by making a

2    strategic decision to include disclaimers in its contractual and

3    promotional language." Appellant's Br. at 14. However, an entity may

4    not escape regulation as a "consumer reporting agency" by merely

5    disclaiming an intent to furnish "consumer reports." For the purposes

6    of the FCRA, indeed for any scienter determination, the totality of a

7    defendant's actions is the determining factor, not the defendant's

8    mere disclaimer of the requisite intent. *Cf.*, *Tellabs, Inc. v. Makor Issues*

9    *& Rights, Ltd.*, 551 U.S. 308, 322-24 (2007) (holding, in the securities

10   fraud context, that courts must consider the total mix of allegations

11   when determining if the defendant had the requisite intent); *Ricci v.*

12   *DeStefano*, 557 U.S. 557, 579-80 (2d Cir. 2009) (considering the whole

13   of the defendant's conduct in determining discriminatory intent in the

14   employment discrimination context).  Indeed, the FTC has enforced

15   the Act against an entity despite its disclaiming any designation as a

16   "consumer reporting agency." *See* Tony Rodriguez & Jessica Lyon,

17   *Background Screening Reports and the FCRA: Just Saying You're Not a*

18   *Consumer Reporting Agency Isn't Enough*, FTC BUSINESS BLOG (Jan. 10,

19

1   2013, 2:00 pm), https://www.ftc.gov/news-events/blogs/business-

2   blog/2013/01/background-screening-reports-fcra-just-saying-youre-

3   not.

4        Finally, Kidd argues that our analysis renders part of the Act's

5   definition of "consumer report"—specifically its focus on the use of

6   the report by the subscriber to make credit, insurance, and

7   employment decisions—irrelevant. Not so. Even if a court were to

8   conclude that an entity is a "consumer reporting agency" because it

9   specifically intended to furnish a "consumer report," a court must still

10  consider whether the report qualifies as such a "consumer report."[10]

11  In doing so, the court must give meaning to each of section 1681a(f)'s

12  terms, including its focus on the conduct of the end-user.

13       Nor is § 1681a(f)'s focus on the intent of the entity furnishing

14  consumer information indifferent to the purchaser's use of the report.

15  For example, if the issuer of such reports were aware of the substantial

---

[10] No doubt, the definitions are connected, but not in a manner that supports Kidd's reading of the Act. 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT, FTC, 2011 WL 3020575 at *13 ("The terms 'consumer reporting agency' in section 603(f) and 'consumer report' in section 603(d) are mutually dependent and must be construed together.").

1    use of the information it supplied as "consumer reports" and did not

2    take adequate measures to stop such use, or did not adequately

3    monitor the actual uses of its information, a fact finder could infer the

4    requisite intent to satisfy the definition of "consumer reporting

5    agency."

6    Accordingly, we are not persuaded by Kidd's proposed

7    interpretation of the FCRA's definition of "consumer reporting

8    agency."

9    II.

10    Having concluded that to qualify as a "consumer reporting

11    agency" an entity must intend to furnish a "consumer report" under

12    the FCRA, we must now determine whether the district court was

13    correct in concluding at summary judgment that Thomson Reuters

14    did not intend that information provided by its CLEAR platform

15    would constitute "consumer reports." Like the district court, we

16    conclude that because it is undisputed that Thomson Reuters took

17    numerous—and effective—measures to prevent CLEAR reports from

18    being utilized as "consumer reports," no reasonable juror could

1    conclude that Thomson Reuters intended to furnish such reports, and

2    therefore it is not a "consumer reporting agency" under the FCRA.

3                                    A.

4        At each gateway to the CLEAR platform, Thomson Reuters

5    instructed users and potential subscribers that the platform was not

6    to be used for FCRA purposes and required them to affirm their

7    understanding of that restriction. Marketing material sent to

8    prospective subscribers explained that CLEAR is meant to be used for

9    law enforcement, fraud prevention, and identity verification (non-

10   FCRA) purposes only,[11] and when potential subscribers apply for

11   access to the platform, Thomson Reuters requires them to indicate

12   how they intend to use CLEAR to ensure compliance with the

13   company's restrictions. When a Thomson Reuters employee suspects

14   an applicant of misrepresenting its reasons, the applicant's

15   application will be reviewed again by a special Thomson Reuters

---

[11] Kidd points to an advertisement in which Thomson Reuters suggested the CLEAR platform may be used to "thoroughly investigate . . . employees." App'x at 350. At the bottom of the page, however, Thomson Reuters stated "[t]he data provided to you by CLEAR may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment purposes or for any other purpose authorized under the FCRA." *Id.*

1    committee established for that purpose. If a customer is granted

2    access to the platform, she is required to sign a contract promising to

3    not use CLEAR in a manner prohibited by Thomson Reuters.

4    Thomson Reuters also periodically requires its CLEAR subscribers to

5    reaffirm that commitment, and each time a user enters a search she

6    must affirm her reason for using CLEAR complies with Thomson

7    Reuters' requirements.

8        In the event these controls fail, Thomson Reuters also employs

9    additional measures to prevent further misuse of the CLEAR

10    platform. If its compliance office determines a user has used CLEAR

11    for an FCRA purpose it will "remind[] the subscriber that FCRA use

12    of CLEAR is prohibited and requires the subscriber to provide a

13    written 'attestation' of its authorized uses of CLEAR and its intent to

14    enforce the subscriber's contractual obligation not to use CLEAR for

15    any FCRA purpose." App'x at 146.

16        These numerous, undisputed controls are sufficient to establish

17    at summary judgment that Thomson Reuters aimed to prevent users

18    from putting CLEAR reports to uses covered by the FCRA. This

1   negates any inferences that Thomson Reuters intended to provide

2   reports for FCRA purposes. Hence, the reports it provided do not

3   qualify as "consumer reports."

4                                    B.

5          Kidd does not dispute any of the foregoing facts. Instead, she

6   argues that we can infer Thomson Reuters' intent to furnish

7   "consumer reports" because it was aware that its controls did not

8   prevent all misuse of CLEAR by its subscribers.

9          To be sure, the record shows that Thomson Reuters was aware

10  of some instances of misuse of its CLEAR platform. But, it is

11  undisputed that the number of reports misused by subscribers was

12  miniscule in comparison to the number of reports generated. No

13  doubt in some cases such knowledge may at least raise a genuine

14  dispute as to whether the entity furnishing the consumer information

15  intended to furnish "consumer reports." That is not the case here,

16  however. Thomson Reuters' extensive efforts to prevent misuse, and

17  to investigate and eliminate it when it occurs, shows that even in the

1 few instances where CLEAR was misused for FCRA purposes,

2 Thomson Reuters did not intend that result.[12]

3      We agree with the district court that the undisputed summary

4 judgment record shows that Thomson Reuters did not intend its

5 CLEAR platform to furnish "consumer reports." We conclude,

6 therefore, that the district court was correct in deciding that Thomson

7 Reuters does not qualify as a "consumer reporting agency" under the

8 FCRA and in granting summary judgment on that basis.

9 **Conclusion**

10      For the foregoing reasons, we **AFFIRM** the district court's

11 judgment in favor of Thomson Reuters.

12

13

---

[12] Kidd also argues that those most likely to abuse the CLEAR platform are not required to certify, during the application process, that they will use the platform for only non-FCRA purposes. But Kidd ignores a key part of Thomson Reuters' protection measures. Each subscriber must certify, each time they attempt to search CLEAR, that their purpose is not covered by the FCRA. Thus, every CLEAR user is warned that using the search platform for FCRA purposes is prohibited.